**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

|   |   |   |
|---|---|---|
| SPUDS VENTURES, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ANHEUSER-BUSCH | : | **JURY TRIAL DEMANDED** |
|     INBEV WORLDWIDE, INC.; | : | |
| ANHEUSER-BUSCH, LLC; | : | Civil Action No. 1:17-CV 1877 |
| ANHEUSER-BUSCH | : | |
|     COMPANIES, LLC; | : | |
| WIEDEN & KENNEDY, INC.; and | : | |
| JOHN DOES 1 to 10, | : | |
| | : | |
| Defendants. | : | |

_____:

## COMPLAINT

**PLAINTIFF SPUDS VENTURES, LLC** (the "Plaintiff"), by its counsel the GIOCONDA LAW GROUP PLLC, hereby complains and alleges against **DEFENDANTS ANHEUSER-BUSCH INBEV WORLDWIDE, INC.**, **ANHEUSER-BUSCH, LLC**, **ANHEUSER-BUSCH COMPANIES, LLC** (collectively, the "Anheuser-Busch Defendants"), **WIEDEN & KENNEDY, INC.** ("W+K") and **JOHN DOES 1 to 10** (all defendants collectively, "the Defendants") on information and belief, except for allegations regarding the Plaintiff or its counsel, as follows:

## NATURE OF THE ACTION

1.    This lawsuit centers on the Defendants' newly-created "Spuds MacKenzie" television commercial and public relations/advertising campaign for Bud Light® beer.

2.      The Defendants' advertising campaign infringes upon the federally registered and unregistered trademarks for Spuds MacKenzie® that are currently owned and used by the Plaintiff for pubs and restaurant services as well as pet products, apparel and other items.

3.      Therefore, this is an action for trademark infringement, false designation of origin, dilution and unfair competition brought pursuant to Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and related causes of action under §§ 349, 350, and 360-L of the New York General Business Law, and for violations of the New York State common law.

**PARTIES AND JURISDICTION**

4.      **PLAINTIFF SPUDS VENTURES, LLC** is a limited liability company organized under the laws of Delaware in or about October 2014, with a principal place of business located at One Commerce Center, 1201 Orange Street, #600, Wilmington, DE 19899. The trademarks at issue and the business surrounding the Spuds MacKenzie® brand have been sold and assigned to the Plaintiff.[1]

5.      **DEFENDANT ANHEUSER-BUSCH INBEV WORLDWIDE, INC.** is a Delaware corporation with a principal place of business at One Busch Place, St. Louis MO 63118.  Defendant Anheuser-Busch InBev Worldwide, Inc. has a permanent place of business located in New York and in this Judicial District located at 250 Park Avenue, New York NY 10177.  Defendant Anheuser-Busch InBev Worldwide, Inc. touts itself as the world's largest beer company, with a portfolio of more than 200 beer brands, including three global flagship beers, one of which is Bud Light®.  The company reportedly holds the No. 1 or No. 2 market position in at least 19 different countries and, in 2015, generated revenues of 43.6 billion dollars.

---

[1]See Exhibit 1 and Exhibit 2 (ETAS Confirmation Nos. TM417833 and TM418909, Reel/Frame: 6000/0296 and Reel/Frame yet to be assigned by the USPTO), reflecting that written assignments of the trademarks at issue to the Plaintiff were duly recorded with the United States Patent and Trademark Office, Assignment Recordation Division, and all fees duly paid.

6.      **DEFENDANT ANHEUSER-BUSCH COMPANIES, LLC** is a Delaware limited liability company with a with a principal place of business at One Busch Place, St. Louis MO 63118.   Defendant Anheuser-Busch Companies, LLC maintains a permanent place of business in New York State, and/or has employees engaged in regular and systematic business activities in this Judicial District and New York State.

7.      **DEFENDANT ANHEUSER-BUSCH, LLC** is a Missouri limited liability company with a principal place of business at One Busch Place, St. Louis MO 63118.   Defendant Anheuser-Busch, LLC maintains a permanent place of business in New York State, and/or has employees engaged in regular and systematic business activities in this Judicial District and New York State.   Per its website, Defendant Anheuser-Busch, LLC is the U.S. arm of Defendant Anheuser-Busch InBev Worldwide, Inc.  Per the online records of the United States Patent and Trademark Office ("USPTO"), Defendant Anheuser-Busch, LLC is also the owner of record of the BUD LIGHT® family of trademarks.   Defendant Anheuser-Busch, LLC is registered to do business in New York State as a foreign limited liability company (DOS ID# 4148947), and the company has designated CT Corporation System, located at 111 Eighth Avenue, New York NY 10011, as its domestic agent for service of process.   Defendant Anheuser-Busch, LLC is currently obstructing the Plaintiff's pending U.S. Trademark Application Serial No. 87/148,812. in the USPTO.

8.      **DEFENDANT WIEDEN & KENNEDY, INC.** ("W+K") is an Oregon corporation with a principal place of business at 224 NW 13th Avenue, Portland Oregon 97209, registered to do business in New York (DOS ID#1927089) that describes itself on its *http://www.wk.com* website as an advertising agency.  W+K's New York Office was paid by the Anheuser-Busch Defendants to create and distribute the infringing television commercial "Bud

Light, the Big Game" as part of the unauthorized Spuds MacKenzie advertising campaign for Bud Light® beer.  W+K is owned and/or controlled by individuals Daniel G. Wieden and David Kennedy.  W+K has a permanent place of business located in New York and in this Judicial District located at 150 Varick Street, New York, NY 10013.  The New York section of W+K's website displays the accused SPUDS MACKENZIE advertisement as one of its recent creations. See Exhibit 3.

9.     **DEFENDANTS JOHN DOES 1 to 10** are unidentified and as-yet unknown individuals and/or entities directly involved and/or contributing to in the Defendants' infringement.  The Plaintiff reserves its right to amend this Complaint to identify these unknown Defendants once its investigation is complete.

10.     This Court has subject matter jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 because this action arises under the Lanham Act.  This Court has supplemental jurisdiction over the Plaintiff's related state law claims under 28 U.S.C. § 1367(a).

11.     This Court has specific personal jurisdiction over each of the Defendants because the Defendants have purposefully availed themselves of the privileges of conducting activities and doing business in the State of New York and in this Judicial District, thus invoking the benefits and protections of New York's laws, by advertising, distributing and selling products to businesses and consumers throughout this District in connection with their infringing uses of the trademarks that are the subjects of the claims set forth herein.  This Court also has personal jurisdiction over the Defendants because their contacts with New York have been continuous and systematic such that general jurisdiction may be asserted against each of them.

4

## MATERIAL FACTS

### Anheuser-Busch, Inc.'s Intentional Abandonment
### of the "Spuds MacKenzie" Brand in the Marketplace

12.     The now-dissolved Anheuser-Bush, Inc. promoted and sold alcoholic Bud Light® beer in the late 1980's using the coined name "Spuds MacKenzie" as the name of a Bull Terrier dog.

13.     Despite their commercial success, Anheuser-Busch, Inc.'s advertisements quickly became the subject of criticism and calls for censorship by temperance-oriented groups.

14.     For example, soon after the advertisements first aired in 1987, U.S. Senator Strom Thurmond began his own media campaign, claiming that the beer maker was using these advertisements to appeal to children to get them interested in their alcoholic products at an early age.  See, e.g. "Teetotaler Thurmond Raps Spuds MacKenzie Beer Promotion," *Associated Press,* Nov. 13, 1987.

15.     By Christmas 1987, more legal action resulted from the use of beer advertisements featuring a dog dressed as Santa Claus, which is illegal in states such as Ohio.

16.     In 1989, the Center for Science in the Public Interest, along with Mothers Against Drunk Driving (MADD), alleged that Anheuser-Busch, Inc.'s beer ads were effectively pitching beer to children.

17.     Due to mounting public pressure, Anheuser-Busch, Inc. decided to abandon all commercial use of the Spuds MacKenzie brand in 1989.

18.     Attached as Exhibit 4 and Exhibit 5 are news stories documenting that Anheuser-Busch, Inc. publicly and intentionally abandoned all use of the Spuds MacKenzie brand in advertising in 1989:

a.   "Spuds MacKenzie was retired by Bud Light in 1989 . . ." *AOL.com*, February 6, 2013; (Exh. 4) and

b.   ". . . Anheuser-Busch probably saw the writing on the wall and retired Spuds MacKenzie after coming under fire from the Center for Science in the Public Interest and Mothers Against Drunk Driving." *CNBC*, July 20, 2013 (Exh. 5).

19.    Consequently, consumers became well-informed that Anheuser-Busch, Inc. would no longer be associated with any ongoing products or services sold in connection with the Spuds MacKenzie brand.

20.    Many media stories document the total and intentional abandonment of the Spuds MacKenzie brand by Anheuser-Busch, Inc.  For example, (emphasis added in each):

a.   *People Magazine*, February 6, 2017: "Spuds' reign as senior party consultant ***officially ended in 1989.***" (Exh. 6);

b.   *Wikipedia.org* notes that the house number in the Defendants' new television commercial is "1989," paying "***homage to the year Spuds was retired.***" (Exh. 7);

c.   "But Spuds' fame was fleeting.  ***The brewer retired the pooch in 1989***." *Advertising Age*, February 2, 2017 (Exh. 8);

d.   "If, by chance, you don't know who Spuds MacKenzie is, it's probably because ***Budweiser retired him in 1989.***" *Mental Floss*, February 7, 2017 (Exh. 9); and

e.   "After two decades away from the spotlight, this controversial pet is back…***In 1989, Spuds was retired and the campaign was phased out*** amidst rumors of the dog's untimely death." *Thrillist.com*, February 5, 2017 (Exh. 10).

21.    The dog that was used in Anheuser-Busch, Inc.'s "Spuds MacKenzie" advertisements died in or about 1993.

**Anheuser-Busch, Inc.'s Intentional Abandonment
of All "Spuds MacKenzie" Trademarks in the USPTO**

22.     Beginning in 1995, the USPTO began to require that Anheuser-Busch, Inc. file

proper Statements of Use under Section 8 and submit proper Specimens of Use, or else risk

losing its multiple federal trademark registrations for its federally-registered Spuds MacKenzie

trademarks.

23.     A Section 8 Declaration of Continued Use is a sworn statement, filed by the

owner of a trademark registration, attesting that the mark is in use in commerce.  15 U.S.C. §

1058.

24.     By November 1995, because Anheuser-Busch, Inc. failed to file Declarations of

Use, each one of the trademark registrations for the Spuds MacKenzie trademarks was officially

cancelled by the USPTO pursuant to 15 U.S.C. § 1058.

25.     Five (5) different federal trademark registrations could have been renewed by

Anheuser Busch, Inc. if it had been in fact, making any *bona fide* commercial use of the Spuds

MacKenzie trademarks:

| ## | U.S. Trademark Registration Number | Mark | Int'l Class | Date USPTO Cancelled Registration | Current Status |
|---|---|---|---|---|---|
| 1 | 1,539,385 | SPUDS MACKENZIE (word mark) | Class 25 (shirts, hats, jackets, sweaters and shorts) | **November 20, 1995** | **DEAD, CANCELLED** |
| 2 | 1,539,386 | *Spuds Mackenzie* | Class 25 (shirts, hats, jackets, sweaters and shorts) | **November 20, 1995** | **DEAD, CANCELLED** |
| 3 | 1,492,513 | *Spuds Mackenzie* | Class 32 (beer) | **December 19, 1994** | **DEAD, CANCELLED** |
| 4 | 1,499,670 | SPUDS MACKENZIE | Class 25 (shirts) | **February 13, 1995** | **DEAD, CANCELLED** |
| 5 | 1,533,386 | SPUDS MACKENZIE (word mark) | Class 28 (play balloons) | **October 9, 1995** | **DEAD, CANCELLED** |

26.     Anheuser Busch, Inc. did not appeal or otherwise object to the USPTO's cancellation of any of its Spuds MacKenzie trademark registrations.

27.     By November 1995, every single one of Anheuser Busch, Inc.'s "Spuds MacKenzie" trademarks was deemed "DEAD" by the USPTO, and was officially cancelled.

28.     From late 1995 to early 2005, the "SPUDS MACKENZIE" trademarks existed in the public domain.

29.     The federal courts have described SPUDS MACKENZIE as a "marketing gimmick." *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 973 F.Supp. 280, 286 (N.D.N.Y. 1997), *aff'd in part, rev'd in part on other grounds*, 134 F.3d 87, 92 (2d Cir. 1998).

30.    Anheuser-Busch, Inc. was voluntarily dissolved.

31.    The Defendants do not own any U.S. federal registrations for "Spuds MacKenzie" or any variant thereof.

32.    The Defendants do not own any pending applications for U.S. federal trademark registrations for "Spuds MacKenzie" or any variant thereof.

33.    The Plaintiff is the only owner of any U.S. federally registered trademarks for "Spuds MacKenzie."

### THE PLAINTIFF'S RIGHTS

### Mark Thomann's and the Plaintiff's Brand Revival Efforts

34.    Mr. Mark Thomann is a member of the Plaintiff, and an entrepreneur who revives dormant brands that were retired and discarded by their former owner, and revitalizes them, typically introducing newly positioned branded products or services that are made relevant again by investing in product innovations that can give a dormant brand a new "reason to believe" and increase the likelihood of a successful revitalization.

35.    As an example, through another company that Mark Thomann is affiliated with, River West Brands ("River West"), Mr. Thomann acquired the intellectual property rights for the COLECO®/COLECOVISION® brands.

36.    Mr. Thomann (individually and through other entities) has re-established brands of yesteryear such as BRIM® (Coffee), COLECO®/COLECOVISION® (Gaming), CROSS COLOURS® (Apparel), SALON SELECTIVES® (Personal Care), NUPRIN® (Cough and Cold), IPANA® (Oral Care), RIVAL® (Pet Food), CLEARLY CANADIAN® (Beverage), EAGLE/ALL SNACK ARE NOT CREATED EAGLE® (Salty Snacks) and AIWA® (Consumer Electronics).

37.    Documents reflecting just a few of these brands that Mr. Thomann successfully reintroduced and which are currently being sold in the marketplace are attached hereto as:

    a.    <u>Exhibit 11</u>:    COLECO®/COLECOVISION®;

    b.    <u>Exhibit 12:</u>    CROSS COLOURS®;

    c.    <u>Exhibit 13:</u>    AIWA®; and

    d.    <u>Exhibit 14:</u>    BRIM®.

38.    Attached hereto as <u>Exhibit 15</u> is a news story dated January 5, 2013 that appeared in the Los Angeles Times, reflecting some of Mark Thomann's activities relating to the brand revival of CLEARLY CANADIAN®, COLECO®/COLECOVISION®, UNDERALLS®, SALON SELECTIVES® and NUPRIN®.

39.    Attached as <u>Exhibit 16</u> is a news story dated October 2011 in FastCompany magazine, reflecting Mark Thomann's efforts as the "reviver" of BRIM®.

40.    Many more articles and major news publications have reported on Mark Thomann's good faith brand revival efforts.

41.    Once Mr. Thomann acquires the rights to an abandoned, discarded brand, he will implement many different strategies to monetize the brand, from licensing to investing in an operating company.

42.    Mark Thomann will deploy and engage a range of commercial resources to help a dormant brand succeed and have a chance at a second life.

43.    These efforts run the gamut from helping engage world-class creative and strategic support, to the recruitment of expert partners, advisors and Board members, to active involvement in the sourcing of additional capital to fuel growth.

44.     Mark Thomann's efforts have created real businesses and real jobs, jobs for people currently employed manufacturing, marketing, and selling Brim® coffee makers, Coleco Vision® plug and play games, Cross Colours® clothes, Aiwa® Bluetooth speakers, and countless other products.

45.     For example, with respect to the Brim® brand, Mark Thomann successfully re-introduced the Brim® coffee brand, through a joint venture (Brim Brands LLC) with a major appliance partner, as a coffee maker that is currently sold nationally at Walmart and other major retailers throughout North America.

46.     Prior to his efforts, the Brim® brand had been dormant for over 10 years and would have remained dormant if Mark Thomann had not rescued it from the company that had killed it in favor of their Sanka® brand of decaffeinated coffee.  Mark Thomann is now in the process of re-introducing Brim® as a full-flavored coffee brand.

47.     In the 1980's, Coleco had been a popular home video game system, competing with systems such as Atari.  However, in 1988, Coleco went bankrupt.  Coleco's assets were purchased in 1989 by Hasbro and they decided to put the Coleco and ColecoVision brands to rest while re-branding various sub-brands such as Scrabble and Cabbage Patch under the Hasbro moniker.

48.     Mark Thomann's initial vision for the brands was to create handheld video games that allowed gamers to play nostalgia games from the 1980's/1990's.  Mark Thomann immediately executed a licensing deal with Techno Source USA who developed and sold merchandise at mass retailers throughout North America and generated millions of dollars of licensing revenues for Coleco Holdings LLC.

49.     In 2006, Mark Thomann introduced a new line of games which including the Disney Princess Pals handheld, the Coleco Carl Edwards NASCAR Racing Plug and Play, and the "Coleco Sonic," a handheld system that included 20 classic video games such as "Sonic the Hedgehog." These products, along with other 13 Coleco branded games, were exclusively sold at Target Stores throughout the United States.

50.     Most recently, Coleco Holding and Atgames Digital Media Inc. partnered to launch the ColecoVision Flashback which is a plug and play video game console with 60 built in games. The ColecoVision® Flashback is currently available through Dollar General, Sam's Club, and Toys "R" Us with additional retailers in the pipeline.

**The Plaintiff's Good Faith Efforts to
Build a New Business Around the Spuds MacKenzie Brand**

51.     On or about August 28, 2013, the Plaintiff purchased the Internet domain name *http://www.SpudsMacKenzie.com* from domain name reseller *BuyDomains.com,* to use in connection with pet products.

52.     The Plaintiff currently owns this Internet domain name and uses an active website associated with it to promote and market products and services branded with the trademark Spuds MacKenzie®.

53.     The Plaintiff has also used and currently uses the domain name *http://hipster011.wixsite.com/spuds-site* to promote and market related Spuds MacKenzie-branded products and services.

54.     The Plaintiff has also used and currently uses third party Café Press to promote and sell a wide variety of Spuds MacKenzie-branded products, including but not limited to: pet products, t-shirts, sweatshirts, tote bags, hats, decals, magnets, mousepads, clocks, calendars,

blankets, golf balls, coasters, keychains, drinkware, pajamas, jewelry and watches. See
*http://www.CafePress.com/Spuds.*

55.     The Internet domain name *http://www.SpudsMcKenzie.com* (*McKenzie* instead of
*MacKenzie*) was also registered by and owned by the Plaintiff.

56.     This Internet domain name automatically redirects all users who may misspell the
"Spuds MacKenzie" domain name to the Plaintiff's Café Press storefront.

**In August 2013, Mark Thomann Filed a Good Faith**
**Intent-to-Use Trademark Application**
**for "Spuds MacKenzie" that the Defendants Did Not Oppose**

57.     On or about August 25, 2013, Mark Thomann filed an Intent-to-Use ("ITU")
Trademark Application for "Spuds MacKenzie" in the USPTO, Serial No. 86/031,766, by paying
all necessary fees and submitting all required disclosures (the "'766 Trademark Application").

58.     The '766 Trademark Application was based upon Mr. Thomann's *bona fide* intent
to use the Spuds MacKenzie trademark in commerce in the United States in International Class 5
in connection with a variety of pet-related products.

59.     The USPTO, upon determining that no confusingly similar registered or pending
marks existed on the Principal or Supplemental Register, concluded that there were no pre-
existing marks likely to cause confusion with the '766 Trademark Application.

60.     The USPTO approved the '766 Trademark Application for publication in the
Official Gazette.

61.     The '766 Trademark Application was published in the Official Gazette on or
about April 29, 2014.

62.     No one opposed the '766 Trademark Application.

63.     The Defendants did not oppose the '766 Trademark application.

64.     On August 25, 2015, the '766 Trademark Application matured into U.S. Trademark Reg. No. 4,800,247 (the "'247 Trademark Registration") for Spuds MacKenzie® in International Class 5.

65.     The '247 Trademark Registration has been assigned to the Plaintiff.

66.     Attached as Exhibit 17 hereto and reproduced as Figure 1 below is the '247 Trademark Registration in International Class 5 for "deodorizing preparations for pet litter boxes; dietary pet supplements in the form of pet treats; dietary supplements for pets; dietary supplements for pets in the nature of a powdered drink mix; feed supplements for pets; medicated grooming preparations for pets, namely, shampoos and cleaning supplies in the nature of ear cleaners; sore skin ointment for pets; vitamins for pets."



# United States of America

### United States Patent and Trademark Office

# Spuds MacKenzie

**Reg. No. 4,800,247**

**Registered Aug. 25, 2015**

MARK THOMANN (UNITED STATES INDIVIDUAL)
3759 NORTH MAGNOLIA AVE
CHICAGO, IL 60613

**Int. Cl.: 5**

FOR: DEODORIZING PREPARATIONS FOR PET LITTER BOXES; DIETARY PET SUPPLE-
MENTS IN THE FORM OF PET TREATS; DIETARY SUPPLEMENTS FOR PETS; DIETARY
SUPPLEMENTS FOR PETS IN THE NATURE OF A POWDERED DRINK MIX; FEED SUP-
PLEMENTS FOR PETS; MEDICATED GROOMING PREPARATIONS FOR PETS, NAMELY,
SHAMPOOS AND CLEANING SUPPLIES IN THE NATURE OF EAR CLEANERS; SORE
SKIN OINTMENT FOR PETS; VITAMINS FOR PETS, IN CLASS 5 (U.S. CLS. 6, 18, 44, 46,
51 AND 52).

**TRADEMARK**

**PRINCIPAL REGISTER**

FIRST USE 6-9-2015; IN COMMERCE 6-9-2015.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-
TICULAR FONT, STYLE, SIZE, OR COLOR.

SN 86-031,766, FILED 8-7-2013.

AMY ALFIERI, EXAMINING ATTORNEY



Director of the United States
Patent and Trademark Office

**FIG. 1**

**In August 2016, Mark Thomann Filed Another Good Faith
Intent-to-Use Trademark Application for
SPUDS MACKENZIE which Anheuser-Busch, LLC Has Now Obstructed**

67.     On or about August 24, 2016, Mark Thomann filed a Trademark Application for "SPUDS MACKENZIE" in the USPTO, namely, the '812 Trademark Application by paying all necessary fees and submitting all required disclosures.

68.     The '812 Trademark Application was based upon Mr. Thomann's *bona fide* intent to use the SPUDS MACKENZIE trademark in commerce in the United States in International Class 43 for "bar services; beer garden services; pubs; restaurant services; restaurant services, namely, providing of food and beverages for consumption on and off the premises; and taproom services."

69.     The USPTO, upon determining that no confusingly similar registered or pending marks existed on the Principal or Supplemental Register, concluded that there were no pre-existing marks likely to cause confusion with the '812 Trademark Application.

70.     The USPTO approved the '812 Trademark Application for publication in the Official Gazette.

71.     The '812 Trademark Application was published in the Official Gazette on or about January 24, 2017.

72.     The '812 Trademark Application and all related business has been assigned to the Plaintiff.

73.     Defendant Anheuser-Busch, LLC has sought a ninety-day extension of time to oppose the '812 Trademark Application, representing to the USPTO on February 17, 2017 that it "needs additional time to investigate the claim."

16

74.     Anheuser-Busch, LLC did not seek to oppose the '812 Trademark Application until after the Defendants' conduct had already done irreparable harm to the Plaintiff.

### Other Pending Trademark Applications Owned by the Plaintiff

### The '908 Trademark Application

75.     On or about March 1, 2017, the Plaintiff filed a Trademark Application for "Spuds MacKenzie" in the USPTO, Serial No. 87/353,908 paying filing all necessary fees and submitting all required disclosures (the "'908 Trademark Application").

76.     The '908 Trademark Application was based upon Plaintiff's use of the "Spuds MacKenzie" trademark in commerce in the United States in International Class 25 in connection with "Short-Sleeve T-Shirts, Long-Sleeve T-Shirts, Golf Shirts, Sweatshirts, Tank Tops, Baseball Caps, Pajamas".

### The '890 Trademark Application

77.     On or about March 1, 2017, the Plaintiff also filed a Trademark Application on an Intent-to-Use basis for "Spuds MacKenzie" in the USPTO, Serial No. 87/353,890 by paying all necessary fees and submitting all required disclosures (the "'890 Trademark Application").

78.     The '890 Trademark Application was based upon the Plaintiff's *bona fide* intent to use the "Spuds MacKenzie" trademark in commerce in the United States in International Class 31 in connection with "Pet food."

### The '433 Trademark Application

79.     On or about March 9, 2017, the Plaintiff also filed a Trademark Application on an Intent-to-Use basis for "Spuds MacKenzie" in the USPTO, Serial No. 87/365,433 by paying all necessary fees and submitting all required disclosures (the "'433 Trademark Application").

80.     The '433 Trademark Application was based upon the Plaintiff's *bona fide* intent to use the "Spuds MacKenzie" trademark in commerce in the United States in International Class 28 in connection with "Pet toys."

81.     Collectively, the Plaintiff's: (a) '247 Trademark Registration; (b) '812 Trademark Application; (c) '890 Trademark Application; (d) '908 Trademark Application; and (e) '433 Trademark Application, are referred to herein as "the Plaintiff's Trademarks."

## THE DEFENDANTS' INFRINGEMENT

82.     The Defendants' recent advertising campaign conjured up the long-departed "ghost" of the Spuds MacKenzie brand to advertise, promote and sell Bud Light[®] beer.

83.     The Defendants have not sought or received approval from, paid any royalties to or received any license to use the Plaintiff's Trademarks in commerce.

## The Defendants' Infringing Press Release

84.     To solicit media coverage, to gain a broader audience for its infringing television commercial advertisements and to promote and advertise their Bud Light[®] beer, the Anheuser-Busch Defendants issued a widely-disseminated press release, saying that they were "***re-introducing*** . . . ***Spuds MacKenzie***" as part of their wider Bud Light[®] advertising campaign. See February 2, 2017 Press Release attached as Exhibit 18 (emphasis added).

85.     Specifically, the Anheuser-Busch Defendants announced in their February 2, 2017 Press Release: ***"[a]lthough Spuds will be shedding his former persona***, his message of lasting friendships is one that intends to resonate across generations, and integrate with Bud Light's broader 'Famous Among Friends' brand campaign,' said AB InBev." Id. (emphasis added).

86.     The Anheuser-Busch Defendants' infringing <u>Press Release</u> garnered significant media attention, with numerous media outlets quoting verbatim from it.  <u>See, e.g.</u>, *Fortune.com*, Feb. 2, 2017.

87.     The Defendants' unauthorized use of the Plaintiff's Trademarks was broadcast to the media on or about the same date as the Anheuser-Busch Defendants' infringing <u>Press Release</u>.

88.     This infringing <u>Press Release</u> created additional media "buzz," and was intentionally designed by the Defendants to create broader visibility of the infringing advertising, to increase their sales of Bud Light® beer.

**<u>The Defendants' Infringing<br>Super Bowl LI (51)<br>Television Commercial</u>**

89.     To promote and to sell their alcoholic Bud Light® beer, as part of their wider "Famous Among Friends" advertising campaign, the Anheuser-Busch Defendants invested millions of dollars to create and to broadcast a ninety-second television commercial called "The Big Game," which was created by New York-based employees of Defendant Wieden + Kennedy, an advertising agency.

90.     The Defendants' unauthorized use of the Plaintiff's Trademarks in connection with a dog was broadcast during the February 5, 2017 Super Bowl LI (51) to promote the Anheuser-Busch Defendants' Bud Light® beer products to over 111 million viewers worldwide.

91.     In the United States, Super Bowl LI (51) was televised by Fox, as part of a cycle between the three main broadcast television partners of the NFL.

92.     Super Bowl LI (51) was also carried in Spanish by sister cable network Fox Deportes.

93.     Super Bowl LI (51) ranks as the fourth-most-watched television event of all time.

94.   Reproduced below in <u>Figure 2</u> is a screenshot of a scene in the infringing television commercial using the term "Spuds MacKenzie", at 0:12 to 0:15, as reflected in the subtitles:



"Spuds MacKenzie?  What are you doing here?"

**<u>FIG. 2</u>**

95.   Reproduced below in <u>Figure 3</u> is a screenshot of another scene in the infringing television commercial, at 1:20 to 1:27, using the term "Spuds MacKenzie", as reflected in the subtitles:



"That was Spuds MacKenzie reminding you:  you're not here for the parties.  You're here for the friendships."

**FIG. 3**

**The Defendants' Infringing Advertisement Was Also
Widely Broadcast Over the Internet**

96.    In addition to paying the Fox television network millions of dollars to broadcast the infringing television commercial, the Defendants also intentionally posted the infringing television commercial to YouTube® where it has received over thirteen million (13,000,000) views, and continues to receive additional views to the present day.

97.    Online streams of Super Bowl LI (51) were provided via Fox Sports Go; although normally requiring a television subscription to use, Fox made the service available as a free preview for Super Bowl LI (51).

98.    The Anheuser-Busch Defendants also posted the infringing television commercial to the *http://www.BudLight.com* website, where it continues to attract customers and to increase their sales of Bud Light® beer.

99.     W+K posted the infringing television commercial to the New York section of its website *http://www.wk.com*, as well.

100.    The Defendants did not seek or receive approval from, pay any royalties to or receive any license from the Plaintiff to use the Plaintiff's Trademarks before, during, or after their television commercial was widely broadcast and posted on the Internet.

101.    The Defendants did not seek or receive approval from, pay any royalties to or receive any license from the Plaintiff to use the Plaintiff's Trademarks in connection with their infringing Press Release.

102.    The Defendants have therefore trampled upon the Plaintiff's established and lawful prior established rights in the Plaintiff's Trademarks, causing consumer confusion, trademark dilution, economic injury and irreparable harm that must be brought to a halt by this Court.

103.    This type of trademark infringement is often called "reverse confusion."

104.    Reverse confusion occurs when more powerful companies, such as the Anheuser-Busch Defendants and W+K, use the trademark of a smaller, less powerful, senior user, such as Spuds Ventures, LLC, without permission.

105.    Thus, the smaller company is hampered in developing its own senior trademarks, as consumers will assume it is ***he*** who is the infringer, not *vice versa*.

106.    The legal doctrine of reverse confusion is intended to enable small, senior users to protect their trademark rights against larger companies.

107.    Either the Defendants knew about the Plaintiff's established rights and trademarks, or they were careless, and failed to conduct ordinary due diligence to search for the Plaintiff's Trademarks before creating and broadcasting their commercial.

108.    If the Defendants were careless, it was certainly not due to their lack of resources.

109.    For example, the Anheuser-Busch Defendants collect over 40 billion dollars each year in gross revenue.

110.    The Anheuser-Busch Defendants also spent millions of dollars purchasing the 90-second airtime during Super Bowl LI (51).

111.    Further, the Anheuser-Busch Defendants have themselves sought to register and have successfully registered hundreds of federal trademarks.

## FIRST CLAIM FOR RELIEF

## (AGAINST ALL DEFENDANTS)

**Federal Trademark Infringement in Violation of Section 32 of the Lanham Act**

**(15 U.S.C. § 1114)**

112.    The Plaintiff hereby repeats each and every allegation set forth in paragraphs 1 to 111 above as if fully set forth herein.

113.    Section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a), prohibits any person from using in commerce, without the consent of the registrant:

> any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . .

114.    The Plaintiff's Trademarks are federally registered and/or will be federally registered.

115.    The Plaintiff's Trademarks are inherently distinctive.

116.    The Defendants have used reproductions of one or more of the Plaintiff's Trademarks in connection with the advertising, sale, offering for sale and/or distribution of goods for their own financial gain.

117.    The Plaintiff has not authorized the Defendants' use of any of the Plaintiff's Trademarks

118.    The Defendants' unauthorized use of the Plaintiff's Trademarks on or in connection with the advertising and sale of goods constitutes the use of at least one of the Plaintiff's registered trademarks in commerce.

119.    The Defendants' unauthorized use of the Plaintiff's Trademarks is likely to cause confusion, mistake, or deception; cause the public to believe that the Plaintiff's products emanate or originate from the Defendants when they do not, or that the Defendants have authorized, sponsored, approved or otherwise associated itself with the Plaintiff or their products marketed and advertised in connection with the Plaintiff's Trademarks.

120.    Accordingly, the Defendants have engaged in trademark infringement in violation of 15 U.S.C. § 1114.

121.    The Defendants' acts have caused, and will continue to cause, irreparable injury to the Plaintiff.

122.    The Plaintiff has no adequate remedy at law and is thus entitled to damages in an amount yet to be determined.

## SECOND CLAIM FOR RELIEF

## (AGAINST ALL DEFENDANTS)

**Trademark Infringement, False Designation of Origin and Unfair Competition
In Violation of Section 43(a) of the Lanham Act**

**(15 U.S.C. § 1125(a))**

123.    The Plaintiff hereby repeats each and every allegation set forth in paragraphs 1 to 122 above as if fully set forth herein.

124.     Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) provides, in relevant part, that:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(1)(a) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

125.     By making unauthorized use, in interstate commerce, of the Plaintiff's Trademarks, the Defendants have used a "false designation of origin" that is likely to cause confusion, mistake or deception as to the affiliation or connection of the Defendants with the Plaintiff and as to the origin, sponsorship, association or approval of the Plaintiff's services and goods by the Defendants, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

126.     The Defendants' acts constitute the use in commerce of false designations of origin and false and/or misleading descriptions or representations, tending to falsely or misleadingly describe and/or represent the Plaintiff's products as those of the Defendant, and *vice-versa* in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

127.     This type of trademark infringement is often called "reverse confusion."

128.     Reverse confusion occurs when a more powerful company uses the mark of a smaller, less powerful senior user.

129.     The doctrine of reverse confusion is intended to enable small, senior users to protect their trademark rights against junior users whose marks have gained commercial strength through extensive marketing.

130.     The Defendants' wrongful acts will continue unless and until enjoined by this Court.

131.    The Defendants' acts have caused and will continue to cause irreparable injury to the Plaintiff.  The Plaintiff has no adequate remedy at law and is thus damaged in an amount yet to be determined.

### THIRD CLAIM FOR RELIEF

### (AGAINST ALL DEFENDANTS)

**Deceptive Acts and Practices Unlawful in Violation of the New York General Business Law**

**(N.Y. Gen. Bus. Law §§ 349 and 350)**

132.    The Plaintiff hereby repeats each and every allegation set forth in paragraphs 1 to 131 above as if fully set forth herein.

133.    New York General Business Law, Section 349 states, in relevant part, that: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

134.    New York General Business Law, Section 350 states, in relevant part, that: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

135.    Through their advertisement, distribution, offer to sell and sale of unauthorized products in connection with the Plaintiff's Trademarks, the Defendants have engaged in consumer-oriented conduct that has affected the public interest of New York and has resulted in injury to consumers in New York.

136.    The Defendants' deceptive acts or practices, as described herein, are materially misleading.  Such acts or practices have deceived or tend to deceive a material segment of the public to whom the Defendants have directed their marketing activities, and the Plaintiff has been injured thereby.

137.    By the acts described above, the Defendants have engaged in deceptive acts or practices in the conduct of business and furnishing of services in violation of Section 349 and 350 of the New York General Business Law.

138.    The Defendants' acts have caused, and will continue to cause, irreparable injury to the Plaintiff.  The Plaintiff has no adequate remedy at law and is thus damaged in an amount not yet determined.

<u>**FOURTH CLAIM FOR RELIEF**</u>

<u>**(AGAINST ALL DEFENDANTS)**</u>

**Trademark Infringement in Violation of New York State Common Law**

139.    The Plaintiff hereby repeats each and every allegation set forth in paragraphs 1 to 138 above as if fully set forth herein.

140.    The Plaintiff owns all right, title and interest in and to the Plaintiff's Trademarks as described above, including all common-law rights in these trademarks.

141.    The advertisements used by the Defendants incorporated imitations of the Plaintiff's Trademarks and/or common law trademarks. The Defendants' use of the Plaintiff's Trademarks is unauthorized, and is likely to cause consumer confusion.

142.    By the acts described above, the Defendants have engaged in trademark infringement in violation of the common law of the State of New York.

143.    The Defendants' acts have caused, and will continue to cause, irreparable injury to the Plaintiff.  The Plaintiff has no adequate remedy at law and is thus damaged in an amount not yet determined.

### FIFTH CLAIM FOR RELIEF

### (AGAINST ALL DEFENDANTS)

**Injury to Business Reputation / Dilution
in Violation of the New York General Business Law**

**(N.Y. Gen. Bus. Law § 360-L)**

144.    The Plaintiff hereby repeats each and every allegation set forth in paragraphs 1 to 143 above as if fully set forth herein.

145.    N.Y. Gen. Bus. Law § 360-L provides that:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

146.    By the acts described above, the Defendants have engaged in conduct in violation of N.Y. Gen. Bus. Law § 360-L.

147.    The Defendants have committed the above alleged acts with disregard of the Plaintiff's rights, and the Plaintiff is therefore entitled to preliminary and permanent injunctive relief.

148.    The Defendants' acts have caused and will continue to cause irreparable injury to the Plaintiff.  The Plaintiff has no adequate remedy at law and is thus damaged in an amount yet to be determined.

## SIXTH CLAIM FOR RELIEF

## (AGAINST ALL DEFENDANTS)

### Unfair Competition in Violation of the New York Common Law

149.    The Plaintiff hereby repeats each and every allegation set forth in paragraphs 1 to 148 above as if fully set forth herein.

150.    By the acts described above, the Defendants have engaged in unfair competition in violation of the common law of the State of New York.

151.    The Defendants have committed the above alleged acts in conscious or reckless disregard of the Plaintiff's rights, and the Plaintiff is therefore entitled to exemplary and punitive damages pursuant to the common law of the State of New York in an amount sufficient to punish, deter and make an example of the Defendants.

152.    The Defendants' acts have caused and will continue to cause irreparable injury to the Plaintiff.  The Plaintiff has no adequate remedy at law and is thus damaged in an amount yet to be determined.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff prays:

1. For a **FINAL JUDGMENT** that:

a.  The Defendants have engaged in trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114;

b.  The Defendants have violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);

c.  The Defendants have engaged in deceptive acts and practices unlawful in violation of Sections 349 and 350 of the New York General Business Law;

d.  The Defendants have engaged in trademark infringement in violation of the common law of the State of New York;

e.  The Defendants have diluted the distinctiveness of the Plaintiff's Trademarks and caused injury to the Plaintiff's business reputation in violation of Section 360-L of the New York General Business Law;

f.  The Defendants have engaged in unfair competition in violation of the common law of the State of New York; and

g.  That the above acts were done willfully, and/or intentionally.

2.  For entry of an **ORDER** preliminarily and permanently enjoining and restraining the Defendants, and their officers, agents, servants, employees and attorneys and all those in active concert or participation with any of them, from:

a.  Using any reproduction, counterfeit, copy or colorable imitation of the Plaintiff's Trademarks (as defined herein) for and in connection with any goods or services not authorized by the Plaintiff;

b.  Engaging in any course of conduct likely to cause confusion, deception or mistake, or to injure Plaintiff's business reputation or dilute the distinctive quality of the Plaintiff's Trademarks;

c.  Using any false description or representation, including words or other symbols tending falsely to describe or represent the Defendants' unauthorized goods as being those of the Plaintiff, or sponsored by or associated with the Plaintiff, and from offering such goods into commerce;

d.  Further infringing the Plaintiff's Trademarks by manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising,

promoting, renting, displaying or otherwise disposing of any products not authorized by the Plaintiff that utilize any simulation, reproduction, counterfeit, copy or colorable imitation of the Plaintiff's Trademarks;

e.   Using any simulation, reproduction, counterfeit, copy or colorable imitation of the Plaintiff's Trademarks in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of any unauthorized products or their packaging in such fashion as to relate or connect, or tend to relate or connect, such products in any way to the Plaintiff, or to any goods sold, manufactured, sponsored or approved by, or connected with the Plaintiff;

f.   Making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which may or is likely to lead the trade or public, or individual members thereof, to believe that any products manufactured, distributed, or sold by the Defendants are in any manner associated or connected with the Plaintiff, or are sold, manufactured, licensed, sponsored, approved or authorized by the Plaintiff;

g.   Infringing the Plaintiff's Trademarks, or the Plaintiff's rights therein, or using or exploiting the Plaintiff's Trademarks, or diluting the Plaintiff's Trademarks;

h.   Secreting, destroying, altering, removing, or otherwise dealing with the unauthorized products or any books or records which contain any information relating to the importing, manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, renting or

displaying of all unauthorized products which infringe or dilute the Plaintiff's Trademarks; and

i.  Effecting assignments or transfers, forming new entities or associations or utilizing any other device to circumvent or otherwise avoid the prohibitions set forth in any Final Judgment or Order in this action; and

3. For entry of an **ORDER** requiring the Defendants to disseminate corrective advertisements in a form approved by the Court to acknowledge their violations of the law hereunder, and to ameliorate the false and deceptive impressions produced by such violations.

4. For all such other relief as the Court may deem appropriate to prevent the trade and public from deriving any erroneous impression that any products or associated packaging manufactured, sold or otherwise circulated or promoted by the Defendants are authorized by the Plaintiff or related in any way to the Plaintiff's products.

5. For an assessment of the **ACTUAL DAMAGES** suffered by the Plaintiff, trebled, and an award of **ALL INFRINGING PROFITS** that Defendants have derived from using the Plaintiff's Trademarks, trebled, as well as costs and attorneys' fees to the full extent provided for by Section 35 of the Lanham Act, 15 U.S.C. § 1117.

6. For **COSTS OF SUIT**, and for such other and further relief as the Court shall deem appropriate.

## A TRIAL BY JURY IS DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Plaintiff hereby demands a jury trial on all triable issues raised by this Complaint.

March 15, 2017                                         Respectfully Submitted,

Joseph C. Gioconda (JG4716)
Joseph M. Forgione (JF8630)
THE GIOCONDA LAW GROUP PLLC
100 Park Avenue, 16th Floor
New York, NY 10117
Telephone: (212) 235-1220
Facsimile: (888) 697-9665
*Joseph.Gioconda@GiocondaLaw.com*
*Joseph.Forgione@GiocondaLaw.com*

Attorneys for Plaintiff
*Spuds Ventures, LLC*

33